1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 10-cr-00091-REB

UNITED STATES OF AMERICA,

Plaintiff,

vs.

SOLOMON BEN-TOV COHEN,

Defendant.

_____

REPORTER'S TRANSCRIPT
Defendant's Motion to Set Bond

_____

        Proceedings before MAGISTRATE JUDGE KRISTEN L. MIX, United States Magistrate Judge for the District of Colorado, commencing at 10:10 a.m. on October 7, 2010, in Courtroom C204, United States Courthouse, Denver, Colorado.

                A P P E A R A N C E S

FOR THE PLAINTIFF:
LILLIAN ALVES, AUSA, U.S. Attorney's Office, 1225 17th Street, Suite 700 Denver, CO  80202

FOR THE DEFENDANT:
JOHN S. TATUM, ESQ., John S. Tatum, P.C., 12351 East Cornell Avenue, Aurora CO 80014

Proceedings Recorded by Electronic Sound Recording;
Transcript Produced by Transcription Service

2

PROCEEDINGS

(In open court at 10:10 a.m.)

THE COURT:  Thank you.  Please be seated.  Good morning.  This is Case 10-cr-00091, United States of America v. Solomon Ben-Tov Cohen. Would counsel enter their appearances, please.

MR. ALVES:  Good morning, your Honor. Lillian Alves for the United States Government covering for Mr. Canedy today.

THE COURT:  Good morning, Ms. Alves.

MR. ALVES:  Good morning.

MR. TATUM:  Good morning, your Honor. John Tatum on behalf of Mr. Cohen who is present in custody.

THE COURT:  Good morning, Mr. Tatum.

MR. TATUM:  Good morning, your Honor.

All right.  We're here on the Defendant's Motion to Set Bond.  Mr. Tatum, do you want to be heard on this?

MR. TATUM:  I'm sorry, Judge?

THE COURT:  Do you want to be heard on the motion?

MR. TATUM:  I do, yes.  Thank you.  I apologize.

THE COURT:  All right.

3

MR. TATUM:  Judge, I don't want to be overly repetitive about what I've said in the motion, but I would like to provide you with a little bit of a background into the circumstances.

THE COURT:  That's fine.

MR. TATUM:  Basically, under 8 U.S.C. 1253, Mr. Cohen is charged with having failed to execute passport application or travel documents.  And basically, the circumstances would be he entered the United States -- and I need to make sure that Mr. Cohen hears what I'm saying.  I don't know if the Court has seen any records.  He's filed motions to recuse me.  Those have been denied.  I am trying my best to repair my relationship with him.  So I want to preface everything I'm saying today that I am not admitting any of the allegations, if you will.  I'm just going to discuss what the government's position is and kind of what the circumstances are in general, but we're not conceding, for purposes of trial, any of the facts that we might talk about today, because that was the subject -- one of the things he said in his motion to recuse me that was heard by Magistrate Judge Tafoya was that I had given away part of his defense, or something.  I'd just like the record to state -- I want to say that assuming everything that the

4

government has that it could present today for purposes of bond or even at trial is true, then it's my position he still should be entitled to bond. If I could preface everything with that, then I don't want him to feel that I'm trying to sacrifice any of his defenses.

So in any event, essentially it's undisputed, for the purpose of bond hearing today, Mr. Cohen entered the United States last in about 2002 under what's called the Visa Waiver Program. And I don't want -- if you know a lot of this already from the file, you may want to interrupt me if I get too far afield, but I just want to give a brief background.

And he basically did only stay here for, I believe, 60 days, something like that. And then once you're past that limit, then the government can just -- ICE can deport you without any type of due process in terms of visas or rights to be here or any other immigration type sequence. The only thing you can do is claim asylum; that somehow if you returned to your native land that you would be persecuted. And I don't think it would be any secret, just again for the purposes of what we're talking about today, that, you know, that the average person and probably the

average immigration judge's perception of, you know, the United Kingdom, is not the same as, say, Uganda or places that are known to be dangerous to traveling.

So Mr. Cohen, nevertheless, had a hearing back in roughly 2003 or 2004. He was ordered deported. His petition for asylum was denied. At that time, it turned out he was in custody in the state court of Virginia on a criminal matter that was later dismissed, so he filed a petition, and ICE or the immigration Judge set aside that order of deportation and scheduled another hearing which was held in about 2008 in front of Judge Vandello, an immigration Judge here in Denver, for the purpose of him wanting to come out of Colorado. You know, that's the procedure that we had.

Then there was another hearing, and Judge Vandello ordered Mr. Cohen deported, denied his petition for asylum. Mr. Cohen then exercised various appeals. I'm not going to go into all those appeals, but he exercised the appropriate appeal process. He did all of that pro se. He went all the way to the Tenth Circuit. It was eventually denied.

During the time that that was going on, he also files a habeas corpus civil positions and some other civil proceedings, all of which were eventually

6

denied.  But what is significant for our purposes today is that while all of those matters were pending, ICE directed Mr. Cohen to execute travel documents so that they could deport him, and allegedly he refused to do so.

More critically, in terms of whether there's a likelihood he would flee is -- one of the elements of that is whether he did that in good faith or not.  The government has to prove that he did not execute those travel documents in good faith.  And I'll represent to you that as an officer of the Court that we have evidence that -- in fact, it will be undisputed, I'm sure, because, you know, the record in front of the Tenth Circuit Court of Appeals and so forth will all be public record and, you know, matters not subject to disputes.

He was in the process of litigating the efficacy of the deportation at the time.  So in terms of good faith, when a man is exercising his legal rights he can argue to a jury that in good faith I was resistant, you know, being forced to sign these documents because I had legal proceedings going on. And we have -- there are witnesses within the ICE itself who will testify that there were negotiations with Mr. Cohen about the possibility of him

7

immigrating to Israel.  And there were documents that were obtained, packets and materials that were discussed, and things like that.  So we'll be able to make an interesting argument at trial on the issue of good faith.  Mr. Cohen's aware of all these things.  So you know, he knows he has a reasonable argument to present at trial in front of the jury.  So factually, in terms of his case, that would negate his motivation to flee.  That's the reason I'm bringing that up.  I don't want to sit here and argue that we'll win or not win or anything else, in terms of his mental awareness.

The other issue with respect to whether he's a flight risk, Judge, and I won't repeat everything I said in the motion.  I know that your Honor's had a chance to read it, but, you know, if he's convicted, the guideline range is zero to six months.  He's already been in jail, pretrial confinement for seven months on this charge.  Before that, you know, he's been in ICE custody for about the last two years.  All of that jail that he served the last two or three years could be remedied by him pulling out a piece of pencil and signing a form saying I'll go back to England.  So it's very apparent that Mr. Cohen does not want to go to England, and he

8

wants to be in the United States.  And I don't know that I've ever seen anybody go through as much pain and agony, if you will, as this gentleman has, and I don't know if it's the wisest course of action.  I don't know that I would have sat there in the FDC and the ICE custody and everything for a couple of years to try to stay in the United States, but the bottom line is that he believes that if he goes back to England he will be persecuted, subjected to either mental, hospital intrusions, things like that; that he was at one time admitted for a couple of weeks until he got out of the facility before he came here the last time.  He's worried that he would be, you know, persecuted -- he published a play, Judge, it's a satirical play.  It got some notoriety, it was very critical of the queen and the government and things like that.  A copy of the play is in discovery, and I've read it.  You know, it's certainly offensive to, you know, the establishment, if you will.

But in any event, frankly, his belief might be seen by some as irrational.  Judge Vandello, the Immigration Judge, obviously didn't feel that he had a valid reason, but that's his mind set, and it goes to whether or not he would flee.

THE COURT:  Well, it doesn't address the

issue of whether he would flee to another place besides England, does it?

MR. TATUM:  Well, I think it does from the standpoint that ICE wants him to go.  He doesn't want to go.  They gave him travel documents -- they were trying to negotiate with him.  Look, Solomon, if you don't want to go to England, you know, you have Jewish heritage, he's a very devote Jewish person, his family was traditionally there, Judge, and they were in negotiations about him possibly immigrating to Israel.  And for reasons, you know, various reasons, that fell apart.  So in other words, Mr. Cohen's history is this.  Have you had a chance to read the affidavit of Mr. Howard --

THE COURT:  Yes.

MR. TATUM:  -- his friend of thirty years?  Then you know from those facts that Mr. Cohen left England in the early '90s.  He was a very successful trader, stock trader at that time.  He came to New York, established a very successful business in New York in the '90s.  Judge, he was written -- there was a book published in the '90s on entrepreneurs in the financial industry.  I can't remember the title of the book, I have it at my office, but one of the chapters is "Solomon's Mind."  He's about to become a

10

genius at, I believe it's commodity -- I can't remember, but all of those various things.  But I guess what I'm saying is that he was a very established business person.  You know, his luck began to change.  He at one time had what they call a B-1, B-2 visa.  It's in the discovery documents which allowed him to stay here for a longtime, and he could have been renewed --

THE DEFENDANT:  And a work visa of six years.

MR. TATUM:  He tells me a work visa six years, but his passport was stolen.  Some unfortunate things fell on him at that time.  Judge, there are records -- I know Mr. Cohen would dispute this, but I will tell you there are records in the discovery that indicate that he has mental health issues in the nature of depression, anxiety and paranoia.  I think, from having reviewed all the discovery and problems that he had that were during those intervening years could be in some ways attributed to his mental health issues.

THE COURT:  Well, Mr. Tatum, let me ask you whether any of the conditions that were mentioned in the bail report and that led to the Probation Office recommending against a bond, whether any of

11

those conditions have changed?  ICE has lodged a detainer against the defendant.  JAB's records reflect that the defendant was born in England and is a citizen of that country.  The defendant has a prior failure to appear, and the defendant has an active warrant in California.  Have any of those conditions changed?

MR. TATUM:  I'll tell you what I know about them.  There is an ICE detainer.  The ICE detainer is such that normally that would be a problem because the government is motivated -- if he were charged with a bank robbery and the government needs him to stay in the FDC, in the Justice Department custody so they can prosecute him, if he were released on bond in this case, he would obviously be taken back to ICE and be held over there.  We would have to count on ICE to bring him here.  The danger is that through some type of either miscommunication or ICE just makes up their mind, ICE could deport him and send him home.  If Mr. Thore (phonetic) were charged with bankruptcy and the U.S. attorney here wanted him to do 10 years in prison for his bank robbery, they'd run a risk that being in ICE custody that the interest of justice would be thwarted.  But in this case, I don't think this is disputed.  Ms. Alves can certainly

12

correct me if I'm wrong, but I believe, from my conversation with Mr. Canedy, who is the U.S. attorney normally assigned to the case, he's obviously out on a case right now; but our discussions throughout the entire pendency of the case have been that ICE and Mr. Canedy want Mr. Cohen to sign the paperwork and go home.  All they want is Mr. Cohen to go to England. And I know they are working on various treaty issues and things back in the State Department or the ICE Homeland Security, all those different departments with the British government, I know that there have been, at least it's been reported to me by Mr. Canedy, that they continue even to this day trying to find ways under various treaties and procedures that they can get Mr. Cohen to go back to England.  They would be happy that this case go away.  In fact, the way it was stated to me by the British vice counsel in Houston when I was talking to her is that we would all like to see the back of Mr. Cohen, in a very nice, eloquent British accent.

So the policy and concern that we would normally take -- I have never filed a bond motion on behalf of any client, and I've represented many who had an ICE detainer or a detainer to any other state or federal institution, it's a waste of everybody's

13

time.  But what Mr. Cohen wants now is he wants to go back to ICE.  He would rather be in the custody of ICE than be at the FDC.  The reasons included such things, as most of the people at ICE, some of them have criminal issues, but a lot of them are just folks who have papers or lack of papers and they're just being deported or processed, he feels safer at ICE.  He has a lot of idiosyncrasies in his personality that at the FDC where there are obviously more dangerous group of people on the whole.  He's not a large man, he feels afraid and kind of threatened in the FDC, and he's had some uncomfortable circumstances with inmates there. He never has those problems at ICE.

One minor circumstance, I suppose, is that it only takes me about 30 or 40 minutes to drive from east Aurora out to the FDC and west metro area. My office is about probably 10 minutes from the ICE facility.  It would be more convenient for me, certainly as we approach the trial.

We have 13 boxes of files that Mr. Cohen has that ICE was storing for him while he was in the custody of ICE.  Once he was taken to the FDC, they made arrangements to surrender those with me.  They're now in my office.  There are tons of materials that Mr. Cohen says he would like to go over with me.  If

14

he were at ICE, I could hopefully work out some kind of arrangements to bring those boxes out there and sit down with me and work with me.  It's a little more difficult at the FDC.  I will tell you that I will find a way to get that done.  I don't want you to hear me to say that if you deny this motion that somehow he has a huge problem, but it might be a bit more convenient for me.

THE COURT:  All right.  Well, Mr. Tatum, you understand that I can't order ICE to pick him up on its detainer.  So all I can do today in granting your motion would be to release him on bond.  What happens after that with respect to whether ICE picks him up or not is outside of the scope of what this Court can do.  So I have no assurances that even though he's on an ICE detainer, he'll be picked up by ICE, nor do I have any assurances as to when that might occur.

So in order to satisfy myself that I should release him on bond, which means as far as I'm concerned, putting him out there in the general population of the United States and what happens with ICE in the future is something I cannot control.  I need to decide whether he's, in fact, a flight risk or a danger to the community.  The Probation Department

told me at the time that he appeared initially that they felt that he was a flight risk, and I need to know why you think he isn't.

MR. TATUM:  He had a bond with ICE of $3000, and that bond stayed in effect for a number of years.  He continued to correspond with the ICE court in Virginia even after he was brought, you know, taken into the custody of Colorado.  He filed a petition in the ICE court in Virginia to set aside his previous deportation order and asked to be brought back to, you know, to have his case reopened.  And then the Court, what they did was they transferred jurisdiction and venue from Virginia to here.  That's indicative of the fact that while Mr. Cohen, his case was sort of in limbo with ICE while they were reopening it, and so forth, that while he was here in Colorado that he makes efforts to deal with his immigration problem. He is fighting harder than anyone I have ever seen to stay here.

THE COURT:  I understand that, but he's facing criminal charges now.  This isn't just about whether he's going to get removed from the country or not.  He's got criminal charges pending against him. I understand fully your argument about the sentencing guidelines and the fact that he may have exceeded in

16

the time he's been in custody the amount of time he would ever be sentenced to, but still he's subject to criminal charges in the United States, and that has been plenty of incentive for plenty of other defendants to flee.  I understand his circumstances are unusual, that he's expressed in many ways his desire to stay in the United States, but that desire could be affected by the fact that he's looking at a criminal trial which he could lose and a possibility of some kind of a sentence.

MR. TATUM:  I would ask the Court then in order to address what I think is your concern that the Court set a bond, but he could only be released on the condition that he be released to ICE on his detainer.  Then if ICE -- we could give ICE 30 days to decide if they want him.  And I would think that's reasonable.  Maybe Ms. Alves could tell us whether that's an unrealistic request.

THE COURT:  Yes.  I haven't had a response from the government to your motion, so I would like to hear what the government's position is.

MR. TATUM:  And I guess, you know, I guess our position -- I don't want to be repetitive, but it just seems to me that in a case where you've got someone who is -- in many ways he holds the key to

17

(unclear) and the key is signing a piece of paper.

The fact that he's not to this point signed that piece

of paper which would end this criminal case --

THE COURT:  Well, I mean, I'm not sure I

can jump to that conclusion, either.  The fact that he

signs the piece of paper now, in my view, doesn't

necessarily dispose of the charges that he's been --

you know, that have been levied against him.  I mean,

that's going to be entirely up to the U.S. attorney,

and again, I have no assurances as to whether the

charges would go away.

MR. TATUM:  Perhaps they could enlighten

us.

THE COURT:  Perhaps they can enlighten

us on that.  Thank you.

MR. TATUM:  Thank you, your Honor.

THE COURT:  Ms. Alves.

MR. ALVES:  Your Honor, I'll state my

full position, but just briefly I'd like to get to two

things that counsel mentioned.

One is about the underlying in the

immigration litigation.  There are two separate issues

in immigration litigation.  One is whether someone can

be removed from the United States.  The other is

whether they have relief from removal.  Because Mr.

18

Cohen entered under the visa waiver program, an Immigration court had no jurisdiction to consider his removability.  It was only jurisdiction to consider relief application and only very limited ones of relief.  So in Mr. Cohen's case, it was -- he had an opportunity to apply for the relief, he was eligible to apply for.  It's the government's position that he had a full and fair opportunity to litigate that claim and did not prevail.

Second.  In terms of any sort of agreement to have ICE take him into custody, ICE does not have lawful jurisdiction to warehouse people while they're waiting for their criminal proceedings to be disposed of.  ICE is in the business of removing people from the United States.  So any sort of order that would be issued requesting that ICE have some time to pick him up doesn't change the posture of ICE or its congressionally mandated function which is to remove foreign nationals from the United States who are amenable to removal.

The government has reviewed the motion in this case, and it is our position that the defendant has not shown any new material facts or circumstances that would change the Court's analysis regarding bond as required under 18 U.S.C. 3142(g).

19

This Court noted in February in its findings of facts supporting detention regarding the nature and circumstances of the offense that the defendant is charged with refusal to apply for documents for deportation.  The nature of this offense does involve a willful noncompliance with government procedure or process.  The case involves five counts of refusal to apply for documents of deportation.  The factual circumstances of this case involve several instances of the defendant refusing to complete documentation at the request of ICE that was needed to effect his removal from the United States and additionally, refusing to acknowledge receipts of notices served on him by ICE.

So the nature and the circumstances of this case would tend to support a conclusion that the Court can't be assured that Mr. Cohen would comply with conditions of release set by the Court, or that he would necessarily attend his court appearances. And this has not changed in light of his current motion and has not been addressed by the motion.

Second.  This Court noted in February that there is an ICE detainer in place.  The defendant through counsel has acknowledged that this is still true and has acknowledged that ordinarily bond is not

20

requested when an ICE detainer is present.  And his motion primarily bases his argument on that there is medication available in ICE custody that he prefers and a proximity to his counsel's office.  But this really doesn't address the underlying factual issue posed by an ICE detainer which is that the Court cannot be assured of his appearance in criminal court if he's in the process of being removed from the United States, which is what ICE's function is. Therefore, the government believes this Court should reject that argument.

In terms of the availability of his preferred medication, the government doesn't believe that the defendant has shown that he's been denied medically necessary treatment while in marshals custody.

The government's primarily concerned that Mr. Cohen is a flight risk.  His criminal history does span at least four states in six cities.  He does not appear to have a fixed residence, family ties in the United States or employment.  If he has other means of supporting himself, he has not articulated that.  He has not had lawful immigration status in the United States since 2002.  He was arrested for felony fleeing in Utah in 2006.  His disposition is unknown,

and he still does have a warrant for failure to appear in 2003 for possession of a controlled substance in Santa Ana, California.

In terms of being a danger to the community, the defendant has not been convicted of a crime, but he has had several contacts with law enforcement during his years in the United states, including arrests relating to controlled substances. The government submits that in consideration of all these circumstances, the defendant is both a flight risk and a danger to the community.

THE DEFENDANT:  Am I allowed to say anything?

THE COURT:  All right.  Thank you, Ms. Alves.

MR. TATUM:  Excuse me, your Honor.  Mr. Cohen just advised me that he would like to testify. May I have just a moment --

THE COURT:  Yes, you may.

MR. TATUM:  -- to discuss that with him?  (Pause.)  May I speak with counsel for just a second, Judge?

THE COURT:  You may.

(Discussion off the record.)

MR. TATUM:  Your Honor, if it please the

22

Court --

THE COURT:  Yes.

MR. TATUM:  -- Mr. Cohen insists that he would like to testify today.  I have told him that he runs substantial risk in testifying in a preliminary proceeding.  I'm even more concerned about him because of the fact that, you know, one of his issues is he professes not to have the medications that he needs, and things like that, and I worry that when he does testify, or if he does testify, that either due to lack of medication or some of his mental health issues that we've discussed previously, that he might get off on issues that could be harmful to his defense.  And I've explained to him that the government would be able to get a transcript of this hearing or cross-examine or possibly present to the jury what he says.  It's my understanding that he wants to do that anyway; but just for the record, I am going to try to keep his testimony limited only to questions that you asked about, issues about why he would flee or not flee and whether he would be dangerous, and hopefully, I can keep it curtailed to that.  And I believe it's Rule 104, the defendant, by testifying on a preliminary matter, does not waive his right, his Fifth Amendment right against self-incrimination.

23

So for the record I'm stating that, but I understand that there is a certain risk that if he gets up and says certain things, he could expose himself to cross-examination as well.

THE COURT:  Yes.

MR. TATUM:  With that record, I believe Mr. Cohen wants to testify.

THE COURT:  All right.  Mr. Cohen, come forward, please.  Stand right here and raise your right hand, sir.

(SOLOMON BEN-TOV COHEN, DEFENDANT, SWORN.)

THE COURT:  Thank you.  Mr. Tatum.

MR. TATUM:  Thank you.

DIRECT EXAMINATION

BY MR. TATUM:

Q    Sir, would you state your full name, spell your last name for the record.

A    Yes.  My name is Solomon Ben-Tov Cohen. C-o-h-e-n.

Q    You understand the nature of the charge that was filed against you that you've been charged with in this case?

A    Yes, I do.

Q    You understand that I'm instructing you as your lawyer not to get into any of the factual

24

circumstances during this testimony today about the charge that you refused to sign certain documents that you testified to.  Do you understand that?

A    Yes.

Q    All right.  Now, understanding that, did you hear the questions the Judge asked a few minutes ago about what your circumstances were when you first appeared in court when the Court found that you were a flight risk?  Just answer that.

A    Yes.

Q    Did you hear the Judge's questions a few minutes ago?

A    Yes, I do.

Q    Okay.  Let me just direct you to specific things.  I'm going to let you answer the questions, but I just want to cover the things that the Judge asked about first, and then if you have some other important things you want to say, you'll get to talk about.  But she asked --

A    This is hard for me, because I am not on my usual psychiatrist recommended medication Adderall for ADHD.  It's very, very hard for me.  Now, I was receiving my medication.  How can I have a fair trial?

Q    Hold on.  Hold on.

A    I mean --

25

Q     You said you were receiving the medication.  Were you receiving that medication while you were being detained at the ICE facility?

A     Yes.  My psychiatrist in Washington, D.C. called the medical director and the psychiatrist, told him he prescribed Adderall for ADHD.  They submitted the application for a non-formulary, they got it approved, I saw a psychiatrist every month for a year and a half and the psychologist every week, and they monitored me on my medication.  They were very, very happy with how I react on that medication.

Q     Hold on.  You just said the doctors were happy?

A     Exactly.  The psychiatrist, yes.

Q     How about you?  Was your ability to concentrate, study your legal materials and things like that better before or after you were taken off that medication?  Let me ask you the question.  Once you got to the FDC, have they discontinued that medication?

A     Yes, they have.  Ever since I was transferred into marshal custody.  You know, I can't focus, I can't concentrate.  It's like being back at school and not being able to sit and write and do my homework.  It's almost like having my brain on the

26

floor.  I had an interview with the doctor --

Q    Hold on.  Hold on.

A    Okay.

Q    We don't need to get into all of those things.  What I'm trying to establish is that --

A    They're not going to give it to me around all these dangerous criminals.  The average person at the FDC is going to get 10 years for bank robbery, for gun charges and whatever.  They just don't like the idea of anybody that -- receiving that medication.  It's like a policy thing.

Q    Hold on.

A    It's not fair.

Q    Okay.  Let me just make sure that I understand it.

A    They can have their policy.  I just -- I don't need to be there.

Q    Hold on.

A    What's changed since the last time we were in court is that I have already done the time even though I'm not guilty.  So therefore, there isn't a sentence that would be imposed.  That has changed.  That makes a big difference.

Q    Hold on.

A    Nobody represented me at a bail hearing

to argue that I'm not a flight risk.  I don't know if this was an administrative error, but we never had the chance to argue bail before.  So we should have the chance to argue it now, the court respected.  I'm sorry.

Q    I was not at the first bail hearing, and I don't know if Judge Mix was or not, but was that one of those circumstances at the first bail hearing that everyone acknowledged there was a detainer from ICE, and so there was no evidence presented by (unclear) okay; is that correct?

A    Janie Yunker said -- she moved the Court to allow her to come back with a bail application, right?  And she never did, and an order of removal was entered, and I complained about it because I've never, ever before been found -- ICE released me on a $3000 bond, you know, to live in a different city, and I showed up for my Immigration court hearing.  That's not indicative that they feel that I'm a flight risk.

Q    You badgered me, I don't mean badgered in a pejorative sense, but you requested that I file a bond motion for a number of months; isn't that true?

A    Yes, it is.

Q    And we're not going to get into all the issues there, but this is the first time that you're

28

aware of that you've actually had an opportunity to even testify or have a lawyer actually stand up and present evidence in support of your request; is that correct?

A    Yes.

Q    As far as you know?

A    Yes.

Q    Now, then, the Judge asked about a failure to appear.  Do you remember having a failure to appear?  Was it in Virginia?

A    You mean in the Immigration case.  Yes. I had traveled to Virginia because my hearings were at Arlington Immigration Court in Virginia.  Even though I didn't have a place to stay, I was sleeping in my car, and this really nasty officer arrested me, right.  Now --

Q    Without getting into personalities --

A    Well, we posted bail, I was released, and then the charges were dismissed, but I had missed an Immigration court hearing because I was in county custody, and they wouldn't take me to my hearing.  So for some reason ICE procedures are that you're ordered to remove in absentia, but then you can file a motion to reopen and get the case reopened, and that's what I did.  And the Immigration judge said it's not your

29

fault that you couldn't be at that hearing because you were in state custody, and the Immigration authorities acknowledges that.

Q    The Judge --

A    Posted bail on the criminal charge, and then the bail was refunded.  It was a cash bond, and all the money was refunded.  And after that, I lived in D.C. to be near the Immigration court.  I think I have a very --

Q    All right.  Hold on.

A    Okay.

Q    Now, you heard the Judge also express concern about a warrant -- is there a nonexpeditable warrant against you for some matter in Santa Ana, California?

A    Yes, there is.  I was staying in San Clemente.  The police stopped me walking down the street.  They just -- not in a vehicle or anything.  When they told me you pass a urine specimen, I refused.  And they said that under California law, that allowed them to charge me with possession of a controlled substance, even though I was not in possession of a controlled substance.  I felt that they had no right to detain me or to arrest me, and I didn't know that by refusing -- they didn't say if you

30

don't give this, ask this, you know, we're prosecuting you.  I was very badly treated --

Q    Without getting back to that case for a second and just get into -- did you leave California?

A    Yes, I did.

Q    Was that case still pending?

A    It is.  And I went to see Congressman Henry Waxman, right, to complain about a bunch of things.  So that's not exactly fleeing, if you see what I mean.

Q    What year?

A    That was in 2003.  I'm certain to win that case when we get to it --

Q    Hold on.

A    -- the one in California, and I have to get to it, if I want to stay in the country, I understand that.  It's a question of which one comes first.

Q    All right.  So you said that while you were pending the case in California, you wanted to go see Congressman Henry Waxman, who is a representative from California?

A    They treated me really badly at that jail.  I mean, I should have died.

Q    And is it the case that when you went to

31

Washington, D.C., you went to the congressman's office, correct? Just answer my questions yes or no for a moment, and if you need to explain it, you will, but I'm just trying to move the hearing along to the point the Judge is concerned about.

A    Yes.

Q    You went to the Congressman's office?

A    They had offered me an appointment on Yom Kippur which I turned down because it's a Jewish holiday. So when I went on November 25th, I did not have an appointment. The Capitol police asked me why are you here, and I said I'm here to make an appointment to see the congressman. And Fred Bush said the congressman makes his own appointments and he's not here. At that point I asked to leave the office, and he wouldn't let me.

Q    And so then you were detained briefly by Capitol police, correct?

A    He made up a charge of making --

Q    Just answer the question.

A    I'm sorry.

Q    Were you angry about the Capitol police?

A    Yes, I was. I had an interview, and then he said, I'm going to drop everything.

Q    Are these charges filed against you by

32

the Capitol police with respect to anything that happened with the congressman?

A     No.

Q     You were not charged, correct?

A     No.  Arrested, but not -- yeah.

Q     But then the Capitol police contacted ICE; is that correct?

A     Yes, that's right.

Q     And that got you brought into the ICE custody, correct?

A     That's right.

Q     And then you've been dealing with your ICE problems ever since?

A     Then they granted me a bond of $3000.  I went to live with my great aunt in Brooklyn, and I travelled from New York to Arlington to court.

Q     Hold on.  During all of those proceedings between 2003 after you got detained by ICE for the first time and up to the present time, has the state of California made any effort at all to extradite you on that matter, that minor matter in California?

A     No.  I spoke to the district attorney, and they didn't want to, the expense of it and --

Q     So you actually contacted the California

authorities and have talked to them about somehow getting that case resolved?

A    Now --

Q    They don't want to go to the expense of that, is that the bottom line?

A    Right.  No one's represented me on that case --

Q    You need to answer my questions.

A    -- but when they will, it can be dropped.

Q    You need to answer my questions.  You need to answer my questions.

A    I'm sorry.

Q    Because I'm just trying to focus you on things that the Judge expressed a concern about.  She wants to know if you're likely to fail to appear again, if you failed to appear the first time.  So the question was is that you have contacted the DA in California, and you have asked them about possibly resolving that case, but they have told you that --

A    It's likely to be dropped.

Q    -- that they do not intend to extradite you on it if you do a test; is that correct?

A    Yes, sir.  I have been arrested since then, and I have not had a failure to appear.  I

34

posted bond and attended court since then.  So that was a unique thing to do with those particular circumstances.

Q    And you were in California, were prepared to address that case in California, and the only reason you didn't address it is that you got to Capitol and you got detained in the congressman's office and then were turned over to ICE?

A    The lawyer wanted a hundred thousand dollars to represent me in that case, and he was saying things that I wouldn't get a fair trial and whatever.  You know, an arrest walking down the street and then for refusing to -- it's nothing.

Q    I'm trying to remember if you addressed the failure to appear, the --

THE COURT:  The bail report indicates ICE detainer, born in England and a citizen of that country; has a prior failure to appear, and defendant has an active warrant in California.

A    Well, I've lived here 20 years.

Q    (By Mr. Tatum)  Hold on.

A    And the first 10 years, I was never arrested.

Q    Mr. Cohen.

A    All right.  I live here.

35

Q    I know.  There's a procedure to get this information from the Judge, and I just want to make sure that I'm being compliant with the questions.

One of the concerns is were you, in fact, born in England?

A    I was born in London, yes, England.

Q    Did you immigrate to the United States --

A    In 1990.

Q    -- in 1990?

A    Yes.

Q    And were you living in New York?

A    Yes, I was.

Q    Tell the Judge what kind of business you were engaged in and for approximately how long.  Don't go into a lot of details.  Just tell her generally what positions were you in.

A    Okay.  While I was working in the city of London, I made a million pounds trading.  I paid 300,000 pounds in taxes.  That left me with $1 million.  I accepted an invitation from traders on Wall Street to visit their offices in 1989, and I moved here in 1990.  The first couple of years, I didn't work.  I simply came in and out on my B-1, B-2 visa, which is valid for life, multiple entry.  That

36

passport was stolen.  And then I got a student visa,

and then in '94, I started my business.

Q      Hold it.

MR. TATUM:  May I approach?  Before you

get to that, may I approach?

THE COURT:  Yes, you may.

MR. TATUM:  Attached to our motion with

Mr. Cohen was an affidavit with an attachment of a

photograph of what appear to be Princess Diana before

she was unfortunately deceased.

Q      (By Mr. Tatum)  Is that you in the dark

shirt in the center of the courtyard?

A      Yes, it is.

Q      Is it unusual for the average guy to be

presented to the Princess?  What did you have to do to

be presented to the Princess?

A      I've given money to a number of

charities over the years from my profits, both in the

UK and in the United States, and those appear on my

tax returns here in the United States.  There was a

(unclear) in memory of Rudolf Nureyev for a time --

Q      I think you've answered the question.

In other words --

A      All right.  I donated money and

presented it to the Princess afterwards.

37

Q      All right.  Now, Mr. Cohen, after you got to the United States, you got here in 1990, you continued your successful stock trading business, correct?

A      In '94, I obtained work authorization. I founded a hedge fund in the Cayman Islands and a company in New York to act as investment advisor.

Q      And how long was that business in operation (unclear)?

A      For more than six years.  In 1996, national acclaim was in a couple of newspapers, including Barons because of the success of the fund made us the top performing fund for 1995.

Q      I referenced a few minutes ago.  I've forgotten the name of the book.  Tell the Judge the title of the book.

A      Oh, the book is some -- It's by Robert Koppel, "Bulls, Bears and Millionaires."  And it's an interview with 12 traders trying to describe the secret of their success.  And the whole of Chapter 4 is an interview that I gave.

Q      What's the name of that book?

A      Solomon's Mind.

Q      And then --

A      I was not being treated for ADHD at that

time.  My immigration lawyer said, do you want me to apply for your green card now, or do you want to simply renew your work visa and get the green card at the end?  I mean, that's a stupid mistake.  Why leave it to the last minute?  By then, I'd (unclear) the landlord stuff --

Q    I really rather you not talk about visas and things like that, all right?

A    The probation thing didn't say that for 10 years I lived in the United States and had never been arrested.

Q    Then you have gone back and forth from the United States, subsequently to England; is that correct?

A    I left the United States without a passport on a travel document.  That was a stupid thing to do.  That was in January 2000.  What a terrible mistake.  And then I came back on a new passport without getting my existing visas put into it, right?

Q    Here's a question for you.

A    I say all those years I lived and worked here, that doesn't count.  The last entry was on a new passport with no visas, you are not allowed to stay. And I say I did not waive my right to anything --

Q    Mr. Cohen, please don't get into that.

A    Oh, I'm sorry.

Q    This is your desire, whether this case were pending or not, to continue to live and work in the United States?

A    Yes, absolutely.

Q    Do you have any desire to go back and live in England?

A    No.  I hate England.  I'm sorry.  I was always miserable there.

Q    If the Judge authorizes bond in your case, do you promise to always appear in court?

A    I promise to appear for court.  I wouldn't miss it for the world.

Q    Have you ever been arrested or even accused in any type of violent act against anybody?

A    No, never.

Q    Will you abide by any conditions that the Judge imposes?

A    Yes, absolutely.  I have a friend who -- in Parker County, that has -- that you have spoken to who says I can live with him.  And if not that, if I'm back at the ICE detention facility, it will just make life so much, and I'll have my medication, I can see the psychiatrist from court at 10 cents a minute

40

instead of a dollar a minute.  I won't be around all these violent people that have already done time, you know, and so on.

Q    It would be your preference to be, if you have to remain in custody, subject to a detainer from ICE, you would prefer to be in ICE for the reasons you just stated; is that correct?

A    That's right.  It will make our life a lot easier.

Q    And you believe that if you were able to get back to ICE and get the other prescription, that your ability to concentrate would facilitate your communication with your attorney, correct?

A    Absolutely.  I'm night and day different on that medication.  They wouldn't prescribe it for me otherwise.

MR. TATUM:  Judge, for the record, he just mentioned there is a friend of his who does live in Parker, Colorado.  He is not able, based on physical circumstances at this time, to allow Mr. Cohen to move in with him.  That's why we couldn't bring him today, but he says probably in the next 30 to 60 days, he might be able to.  So I would be able to supply a name and address of someone to reside with, but I didn't want to make that representation at

this time because that is not available right now. It might be something that would be available in the next 30 to 60 days, but the man has a number of contingencies. He's willing to allow Mr. Cohen to reside with him, but there are reasons right now that he can't. He's not at the house. So that's where we are, and I think the ICE detainer would make that sort of irrelevant at that point, anyway, so I didn't bring the gentleman out. I don't have any other questions.

A    Let me just say that I'm not --

THE COURT:  Thank you.  Cross-examination.

MR. ALVES:  Thank you, your Honor.

CROSS-EXAMINATION

BY MS. ALVES:

Q    Good morning, Mr. Cohen.

A    Good morning.

Q    Now, Mr. Cohen, you said you were first here in 1990?  That's what you said earlier?

A    No.  I first visited the United States in 1987.

Q    Okay.

A    And that's at the time people from Britain --

MR. TATUM:  Mr. Cohen --

THE DEFENDANT:  -- still needed visas.

42

MR. TATUM:  Just answer the questions.

THE DEFENDANT:  Okay.  I'm sorry.

MR. TATUM:  Don't go into (unclear).

A    Okay.  1987 was my first visit.  1989, I spent about four months in the United States, and I decided I wanted to try living here, and I moved here in May 1990.

Q    (By Ms. Alves)  Okay.  And since 1990, how many times did you go back to the United Kingdom?

A    Twenty-five times.

Q    And who did you stay with when you were over there?

A    I owned a small apartment in London up until 2001.  But my main residence was in New York City.  I've been filing taxes here since 1990.  I have a Social Security number and so on.

Q    Have you ever owned any property in the United States?

A    I own two and a half acres of land in California; but, no, I didn't buy anything.  I've made a couple of offers that never went through in the end.

Q    Okay.  So where have you lived since you've been living in the United States?

A    I first lived at 270 17th Street that I sublet from a friend who had moved here from London

43

with Bankers Trust.

Q    And 17th Street, which state is that?

A    Oh, New York City.  That's right.

Q    Okay.

A    And from there I moved to 13 West 9th Street.  I rented a brownstone there, and I also had a house on the beach for the summer that I rented in Fire Island Pines.  Then in 1994, I rented a 2,000 square foot loft at 43 East 20th Street, had the whole second floor, and the landlords lived in the buildings.  They each had a floor.

Q    Okay.

A    That's five years.  And then --

Q    Let me stop you for a second.  When was the last time you leased a place in your own name?

A    In Washington, D.C. in 2007, I decided to -- that address is 1718 U Street Northwest.  I also lived for a time at 11 2nd Street Northeast, which is directly opposite the Supreme Court.

Q    Okay.  So the place in Washington, D.C. in 2007, that was the last time you leased a place in your name?

A    Yes, that's right.

Q    Okay.  And since then, where have you been?

A    My rent was paid by order of the court in Cayman Islands while the matter of the liquidation of my hedge fund went before the Court.  I was fighting it, and I was receiving money every month. Then the Court ended its order and directed that 5.6 million be sent to a lawyer as trustee for me against my advice.  And the lawyer wouldn't continue the payment, the trustee wouldn't continue the payments or pay my rent.  Now, he's associate U.S. law firm have an office here in Denver, Solomon, Pell, Lonhanen & Stitch (phonetic), and the trustee played a nasty trick on me.  He told them that I wasn't a beneficiary of the trust, and the police arrested me, and that's how I came into custody.

Q    So let me --

A    My immigration bond was suspended when I was arrested, but then when those charges were dismissed, the bond was reinstated.

Q    Okay.  Let me stop you there.

A    ICE kept me in custody.

Q    Mr. Cohen, Mr. Cohen, let me slow you down there for a moment.

Do you have any place that you lease in your name right now to go to?

A    No, I don't.

45

Q    Okay.  Now, when was the last time you had employment in the United States?

A    That would be running my own hedge fund.

Q    Okay.  What year was that?

A    It was founded in 1994.  I ran it actively for six years, and in 2007 through the Bondtree Sulton (phonetic) liquidation, it was liquidated really because of the dispute with the actual directors, and part of the capital is in trust for me.

Q    Okay.  Are you able to access them?  Do you have funds that you can access?

A    The trustee apparently is now willing to reinstate the seven and a half thousand dollars a month backdated to 2007 after he's caused all this damage.

Q    Now, in these --

A    My lawyer knows more about that than I do, because he's been in touch.

Q    Now, though, in these proceedings you haven't been able to afford your own lawyer, right?

A    That's right.

Q    Okay.  And how many times have you been arrested in the United States?

A    A few.  I can't remember.  Like in

46

Virginia, I was sleeping in my car near the court and he decided to arrest me, and that's when I missed my Immigration court hearing.  You know, we posted bond, and those charges were dismissed.

Q    Now, we have a report from Probation that shows six arrests for you.  Does that sound right?

A    Can you go over them?

Q    Sure.  I have an April 2000 in San Francisco, California, disorderly conduct and under the influence of drugs.  Were you arrested for that?

A    Yes.  I had a nightmare while staying in a hotel, and I opened the door and I remember shouting, I abdicate at the sky.  Then I realized I wasn't wearing any clothes.  And I -- it took 10 seconds, I shut the door.

Q    Mr. Cohen, let's just slow down for one minute and let's just go through the list, and you can just tell me yes or no, whether you were arrested.

A    There were no drugs at all involved, and they didn't charge me.

Q    I'm just going to ask you whether you were arrested on those cases, if that's okay.

A    Yes.

Q    Can we do that?

A    Yes.

Q    Okay.  Now, I have in July 2003, San Diego, California, you had a driving under the influence and another controlled substance.  Were you arrested for that?  Yes or no.

A    I was arrested, and that's been dropped, too.

Q    Okay.  Then a second one in July 2003 in Santa Ana, California for possession of a controlled substance and under the influence of a controlled substance.  Were you arrested for that?  Yes or no.

A    Falsely arrested.

Q    Okay.  But you were arrested?

A    Yes.

Q    Okay.  September 2003 in Salt Lake City, Utah, felony fleeing.  Were you arrested for that? Yes or no.

A    Yes.  And that was dropped --

Q    Okay.

A    -- as well.

Q    And then we have in June 2005, Fairfax, Virginia, possession of a controlled substance.  Were you arrested for that?

A    Yes.

48

Q     Okay.  And then Palm Beach, Florida, April 2006, failure to return a leased vehicle.  Were you arrested for that?

A     Yes, and that was dropped as well.

Q     Okay.  Now --

A     I'm innocent until convicted?

Q     Yes, of course, you are, Mr. Cohen.

Now, when was the last time you had a British passport.

MR. TATUM:  Judge, I think I have to object to that.

MR. ALVES:  Your Honor, the government believes that Mr. Cohen's capable of asserting his Fifth Amendment right, if you'd like.

THE COURT:  The objection is overruled. Mr. Cohen, to the extent that you wish to keep information to yourself that might incriminate you in connection with the criminal charges against you, you must exercise your right to remain silent.  So if, in response to this question you wish to exercise your right to remain silent, you should do so.  Do you understand, sir?

THE DEFENDANT:  Yes, your Honor.  If the question bothers me, I will simply say --

MR. TATUM:  I'm advising you not to

49

answer that question.  So would you tell the Court whether you're going to answer it or follow my advice?

THE DEFENDANT:  Well, I'd like to try and be helpful, but not at the expense.  Let me have a go.  It could work to my benefit, I think.

Q    (By Mr. Alves)  All right, Mr. Cohen. When was the last --

MR. TATUM:  For the record, I object.

THE COURT:  Yes, I understand.  The objection's overruled.  Mr. Cohen, you have been advised by your attorney not to answer the question because it might incriminate you in your criminal proceedings.  Are you rejecting that advice?

THE DEFENDANT:  Let me hear the question first, and then I'll decide.

THE COURT:  Yes.  Would you repeat the question, please.

MR. ALVES:  Sure.

Q    (By Mr. Alves)  Mr. Cohen, I asked you when is the last time you had your British passport?

MR. TATUM:  I'm sorry, Judge.  I object to the form of that question when she says "had." Does she mean did it expire or what --

THE COURT:  Sustained.  Be a little more

50

clear, Ms. Alves.

MR. ALVES:  Sure.

Q    (By Mr. Alves)  You had --

A    Why don't I just --

THE COURT:  Just a moment, Mr. Cohen. Let's ask for the question.  Go ahead.

MR. ALVES:  Sure.

Q    (By Mr. Alves)  You testified earlier that you'd had a passport that was stolen; is that what you said?

A    I had two passports that were stolen. One contained my H1-B and was current, and the other contained my B-1, B-2 visa.  That passport had expired, but you're required -- you bring the expired one and your current passport to Immigration, right? Okay.  When you get the B-1, B-2 --

MR. TATUM:  Judge, excuse me.  I object.

THE DEFENDANT:  -- they don't transfer it to another passport.

MR. TATUM:  He's giving a lecture on Immigration law right now.

THE COURT:  Right.  Thank you.  Mr. Cohen, we really don't need all that background.  The question that she asked you was did you testify

51

previously that your British passport was stolen.

THE DEFENDANT:  Two passports were stolen, yes.

THE COURT:  All right.

THE DEFENDANT:  In '99 and 2000.

THE COURT:  Thank you.  Let's have a follow-up question to that.

MR. ALVES:  Okay.

Q     (By Mr. Alves)  And so did you last have a British passport in 2000, then, the last time?

A     I replaced --

MR. TATUM:  Judge -- before you answer that.  I think, just for the record, I don't mean to be rude to counsel, but I think I have to object, and I have to advise Mr. Cohen not to answer that question.

THE DEFENDANT:  Okay, then.  On the advice of counsel, I must politely decline to answer that question.

THE COURT:  Thank you.  Any other questions?

MR. ALVES:  No, no more questions.

THE COURT:  Thank you.  Any redirect?

MR. TATUM:  No, no.  Thank you, Judge.

THE COURT:  Thank you.  Mr. Cohen, you

52

may step down and go back to the table.

THE DEFENDANT:  Okay.  Thank you, your Honor.

MR. TATUM:  The Judge, the last thing I would represent to you is not from the Court, and I've discussed this topic briefly with Judge Blackburn on previous occasions.

I was concerned as to whether Mr. Cohen should have court appointed counsel, because there were items in discovery that indicated he might be the beneficiary of a trust, maybe some five million.  I don't know if he said five million pounds, $5 million.  I can't remember the amount.  Millions of dollars, let's say.  If he had access to that, I was concerned that he shouldn't be having court appointed counsel, and I felt I had an obligation to inquire into that.  And I have had e-mail correspondence and written correspondence with a Dr. Holzhacker.  And I can't remember, I think his first name -- is it Richard Holzhacker?

THE DEFENDANT:  Yes.

MR. TATUM:  Gerhardt.  He tells me it's Gerhardt Holzhacker.  I apologize, I didn't bring any file that would have his name, and I apologize.  But Dr. Holzhacker is a doctor in Liechtenstein.  He's

just like esquire or an attorney.  That just means he's a lawyer, and he is Mr. Cohen's attorney.  I have corresponded with him a number of times because he had trouble getting correspondence to Mr. Cohen, because for a while he was in Douglas County and then in FDC and things like that.  So I have been trying to stay in touch with him because as Mr. Cohen testified there could come a time when several million dollars that have been impounded, and I don't mean to use the wrong word.  One time I used the word "impounded" and that concerned Mr. Cohen.  But anyway, there is court control over these funds which he may or may not be entitled to at some point, let's just put it that way.  It's a lot of money, and I had felt it would be my obligation to keep track of that.  And so Dr. Holzhacker has, you know, copied me on his correspondence with Mr. Cohen so that I could see the status.

The last e-mail we got a couple of months ago indicated, as Mr. Cohen testified, something to the effect of there were court orders that had disapproved of the trustee -- you remember when Mr. Cohen testified that he was getting so many thousand dollars a month until a certain time in 2007 he was cut off which left him sort of destitute, I

54

guess.  But in any event, there was this court order disparaging the trustee that that was improper. However, they had to remand it for further hearings to decide would that trustee be kicked off or not, and this Dr. Holzhacker may be appointed to trustee. That's what I'm informed through this Court's findings.  I actually had a couple of the court's order, but it's in German and so I couldn't read it, so I was just kind of relying on the attorney's summary of it.

So it is the case that up until 2007 he was a man of some means, and he may in the future again be a man of some means if this litigation goes his way.  And there is at least one court order recently, according to the interpretation of his attorney who's handling that, that he's been wrongfully -- his funds have been wrongfully withheld.  Again, I've kept up with that because I felt my obligation would be to hand it to the Court if somehow that money, at the least, he would have to hire a lawyer and that sort of thing.  That's what I know about it.

This is a rather complex set of circumstances, Judge, in this case.  This is the most interesting set of circumstances I've ever had in bond

results, I'll say that, and I appreciate your patience.  You were very kind to listen to me and listen to Mr. Cohen, and I have no further evidence to present.

THE COURT:  Thank you.  Is there any evidence that the government wishes to present, Ms. Alves?

MR. ALVES:  No, your Honor.

THE COURT:  Thank you.  Any argument, Mr. Tatum, that you would like to make in addition to the argument you've already made with respect to the motion?

MR. TATUM:  Judge, I think I made my argument at the beginning, for the most part, so I kind of got the cart before the horse.  I really don't have anything more to say.  I would hope that the Court would see -- the only thing that I would add is that I would hope that the Court would see how Mr. Cohen's presence on the witness stand, his enthusiasm for, you know, remaining in the United States, and which again, I believe, would militate against him if he's determined to be a flight risk.

THE COURT:  Thank you.  Ms. Alves, any argument?

MR. ALVES:  No additional argument.

56

Thank you, your Honor.

THE COURT:  Thank you.  All right. There are certain things I want to note for the record with respect to the facts that have been adduced at the hearing today that will factor into my conclusions.

The first is the defendant has indicated that he is unhappy in his current situation in being detained in the federal prison system under the auspices of the Bureau of Prisons because of, in part, his inability to obtain medication that he feels that he needs.

Attached to the motion is a Bureau of Prisons Health Services clinical encounter by provider G. Thomas Klaus, MD, that refers to an examination or at least a meeting that the doctor had with the defendant with respect to his request for certain medication that he believes, the defendant believes works for his ADHD.  And according to this document, the doctor informed Mr. Cohen of the central office refusal of his request for Adderall, and the doctor explained other medication options that Mr. Cohen had.  Mr. Cohen had not taken any of the medications that were offered, and he did not want to try them, and he further refused to sign a refusal form.  So the

doctor had the officer who was with him at the time cosign the refusal.  The doctor noted also in this clinical encounter report that Mr. Cohen's refusal of medication that may have helped his alleged ADD makes me wonder if he really has ADD.  He will need to contact us if he desires to take any of the medication that was offered.

Mr. Cohen's desire to be transferred to another facility, essentially, where he believes that he might receive medication that he wants consistent with his past experience is really not something that the Court can address in a straightforward fashion.  There are a number of concerns that the Court has, many of which I've alluded to in my questions of counsel this morning.

The first is, Mr. Cohen has no guarantee of being picked up by the ICE, if he has issued a release on bond in these proceedings.  Ms. Alves has made it clear that ICE does not perceive it to be its function to warehouse individuals like Mr. Cohen.  The Court has no authority to order ICE to execute its detainer against Mr. Cohen and therefore to pick him up if he is released on bond by this court.  All I can do, as I said earlier, is to make a decision either to keep him in detention or the Bureau of Prisons or

release him to the general population of the United States.  Because I have no control over what ICE will do or won't do, it isn't, in my view, a significant factor in making the determination about whether he should be released or not; that there is an ICE detainer and that he prefers to be picked up by ICE and held in ICE facilities.  I cannot make that happen.  Only ICE by executing its detainer could make that happen.

The second point I want to make is that Mr. Cohen's criminal history reveals that he has had at least arrests in four different states in the United States; in California, in Utah and Virginia and in Florida.  Part of the assessment that I have to make in determining whether a person is a flight risk is to determine whether the person will flee from this jurisdiction which is the District of Colorado.

Mr. Cohen obviously has traveled extensively throughout the United States, at least his criminal history would say so.  He testified under oath that he owns property only in one state and that state is in California.  He further testified that he has nowhere to live here in Colorado if he is released on bond.  He is not currently employed.  Any financial wherewithal that he may have is apparently, at least

for the indefinite future, tied up in proceedings in a foreign country.  All of those factors, along with the factors that relate to the information that's contained in the bail report, militate against a finding that Mr. Cohen is not a flight risk.  In fact, a detainer has been lodged.  Mr. Cohen has admitted that he was born in England, he is a citizen of that country.  He does have a prior failure to appear which relates to charges in Santa Ana, California for possession of a controlled substance, and he does have an active warrant in California.  None of that information has been refuted by what the defendant has presented to the Court today.

Therefore, for the reasons that I indicated in my previous order, the Defendant's Motion to Set Bond is denied.  The defendant will be remanded to the custody of the United States Marshals, and we will be in recess.  Thank you.

(Recess taken at 11:23 a.m.)

* * * * *

60

CERTIFICATE

I certify that the foregoing is a correct transcript to the best of my knowledge and belief (pursuant to the quality of the recording) from the record of proceedings in the above-entitled matter.

Dated this 4th day of November, 2010.


/s/Adrienne Whitlow
_____
8000 E. Girard Ave., #109
Denver, CO  80231
(303) 695-1121